My name is Lori Webb Daniel, and I represent Appellant Aero Electronics. Aero is paying for the cleanup of pollution at a site in Norco, California, a site that was used for decades to test military and aerospace projects. There is serious pollution there. It has contaminated the groundwater. It has migrated to neighboring residential areas, and it is continuing to migrate. At the time final judgment was entered in this case, Aero had paid $10 million, in excess of $10 million, to investigate and remediate the pollution. That number has multiplied since then. Now, E.On admits that it has indemnity obligations to Aero with respect to the cleanup of the pollution at the Norco facility. But E.On wants to hide behind a forum selection clause in its contract with Aero. E.On has refused to pay. Now, the thing about this is the dispute did not arise over the meaning of the E.On contract. Instead, E.On says that it won't pay for these expenses because, number one, E.On disagrees with the reasonableness of the work plan required by the state agencies, state regulators, and, number two, because E.On says that the expenses are not covered by the underlying contract that governs the environmental liabilities in this case. And that contract is not the E.On contract. That's the Wiley contract. By the way, that is pronounced Wiley. A lot of people say Wiley. Are you going to be arguing about the Aero v. Wiley dispute as well as the Aero v. E.On dispute right now? Yes, Your Honor. It's all mixed in together. It's all intertwined. It was all handled together. And that is a really big part of the problem Aero faces here because Aero is facing inconsistent judgments. Could you explain that briefly? I know it's jumping ahead, but it would help me in thinking. If you could do it very succinctly, and assuming that we know a fair amount about this, what's the conflict? The risk. Possible inconsistency. Okay. Two things. Or two. E.On repeatedly has said that Aero's claims against it must be, quote, in line with the Wiley contract. Okay. So that requires a determination of the Wiley contract. Meanwhile, Wiley has sued Aero and has obtained a judgment that E.On disagrees with. E.On says, no, it doesn't think that those claims are covered by the Wiley contract. E.On says Aero has to go to Germany to pursue its indemnification rights. But in Germany, E.On will say it doesn't have to pay because what was awarded to Aero against Aero in the United States really and truly does not fall under the Wiley contract. And they can say the same thing here. But they haven't. They don't want to. They've stayed out of it. Well, I understand that. But the risk of inconsistent contracts doesn't have anything or interpretations has nothing to do with the Foreign Selection Clause. It does have to do with the reasonableness of the Foreign Selection Clause because Aero has been faced with a judgment, an interpretation of the Wiley contract that E.On disagrees with. And if Aero is forced to go to Germany, E.On will argue that the judgment was wrong in the United States, that it's not bound by that judgment, and that a German court should, in essence, disregard that judgment. It's not bound by that judgment because it wasn't a party to it, and it wouldn't be bound here either. Right? I would say it was not a party. So I'm sorry. I'm just saying that I don't see what it is about the Foreign Selection Clause that gives rise to a higher possibility of inconsistent verdicts than if it stayed here. I think I understand now what you're saying. If it stayed here. E.On still isn't bound by the judgment between Wiley and Aero. It can still argue whatever it wants to about that judgment. Because it's not a party to it. Which is exactly the reason why E.On should have been kept in the proceeding. But that's a different question. It would all be decided in one proceeding so that that would avoid the risk of inconsistent judgments. I guess what I'm having perhaps a similar difficulty. You're arguing against the Forum Selection Clause, which requires the dispute under the 2000 agreement to be in Germany. And I had thought you had connected that up with the possibility of inconsistent judgment. So I was having the same difficulty. What are your other arguments against the Forum Selection Clause? Well, the first argument that we've made and we believe is really, to use the words of the courts, compelling. Compelling public policy. Why is that? Because these are all private parties in front of us today, right? There's no state agency or no federal government agency here. Absolutely. And so if the EPA wanted to bring a claim in federal court, is there anything about this whole proceeding that would preclude that? It doesn't preclude it as a matter of law. But the purpose of the Superfund statutes is to shift the cost. One of the fundamental goals is to shift the cost of enforcing cleanup to private parties. And we've cited cases that show that Congress recognized with respect to CERCLA, that the EPA does not have the funds to do this. But let me answer your question. Arrow is on the hook anyway, as far as the governments are concerned, right? It is. If EON is a PERP, which I'm not at all sure it is, it could be on the hook as well, right? Wiley is on the hook in terms of the governments because it was an owner. It is a current owner. And Arrow, tracing back the line of succession, is the original owner at the time of the disposal. I don't see why EON is a PERP at all. But we're assuming for purposes of this case that it might be. Is that right? Right. So what's the government's problem? I mean, no one's here about to go out of business from what anything I can tell. So what's the government's problem? Government's problem is it doesn't have the money to go after it. I understand, but it has judgments against two domestic corporations that it can enforce, no? And it can go after EON in the U.S. even though Arrow can't. The problem is with these environmental cases, the remediation sometimes is not characterized for years. It goes on, it can go on, and a single party may truly run out of the funds to cover. But the government can go after EON. It would be very costly and difficult for the government with its limited resources to pursue EON. But that's a practical argument. You're talking to us about a theoretical argument, it seems to me, about why the forum selection clause shouldn't be enforced, notwithstanding the strong presumption in favor of enforcing private parties' commercial transactions forum selection clauses. And so I guess that's why you're getting theoretical questions from us, because I guess I just don't see why public policy would preclude in this instance the usual preference from being carried forward. Well, first of all, of course precedent is important, but the Ford case, the public policy in the State of California is established by judicial decision and statute. In the Ford case, the appellate court rejected the notion that these contracts, these private allocation issues should be determined to be simply a matter of private interest. It said, no, there could be no more compelling public interest than even the private allocation of cleanup costs. The Ford case said the allocation of cleanup costs is fundamental to any state's environmental policy. Further, the statute, the state Superfund statute, tasks the DTSC with the role and the responsibility of monitoring even private pollution allocation issues. The DTSC in this case has been monitoring this private allocation issue and is very interested in it, opposed enforcement of the forum selection clause in this case. The DTSC cannot fulfill that statutory function that it has if this case is sent off to Germany. Can I ask another question? Under the same agreement, doesn't it say that that interpretation of the agreement is to be governed by the laws of Germany? Yes, Your Honor, it does. Again, though, the dispute here, the focus is not on the meaning of that German contract. It's on local, inherently local fact issues. So this is really a fact dispute. And again, the interpretation of the Wiley contract that designates venue in California and invokes California law, those are the issues we're dealing with in this dispute. Those are local issues, California law. Moreover, I would submit that Ian has waived the right to rely on the German law provision by relying exclusively on American law when asking the district court to interpret the contract. And this court's in the grandpa decision, a recent decision. The grandpa recognized that a party will waive the right to rely on foreign law if it fails to invoke it, and the district court has occurred here. Moreover, if you're going to be talking about Arrow v. Wiley as well, you're about halfway through. I wonder if we shouldn't turn to that. And in that regard, my concern is at the end of it, but I want to make sure we get to it, about the indemnification and the attorney's fees. There was a claim for contractual indemnification, equitable indemnification, and attorney's fees. The equitable indemnification was dismissed without prejudice to refiling in state court, which I'm not sure how that's going to work. But it seems as though the contractual indemnification actually wasn't ruled on. And then on the attorney's fees, the reasonableness of them was referred to the state court. And, again, I don't understand under what rubric the state court can pick that up. And the allocation was determined now and for the future. So my questions are what happened to contractual indemnity? Can the state court rule on the reasonableness of the attorney's fees? And could the state court rule on the allocability of future attorney's fees? Your Honor, in sum, we think that the ruling is seriously flawed. The questions you're asking, I think, go to the damages ruling. We think that the liability ruling is flawed as well. The damages ruling, the serious problem with that is that the parties in the contract basically drew a line in the sand, that Wiley would be responsible for indemnifying the seller if post-closing events were primarily caused by, excuse me, post-closing damage was caused primarily by Wiley's conduct. The seller, which is now the Arrow side, agreed to indemnify Wiley if the damages arose from pre-closing conduct. So there are lines drawn in the sand, but they're counterbalancing indemnities. You know, Wiley has an indemnity obligation here, too, and the district court did not consider that. And the problem is, is that to resolve who's responsible, it goes to the heart of really the state court proceedings, the toxic tort cases. Was this, did those cases arise out of Wiley's intentional refusal to test and clean up and remediate pollution after learning of the contamination after the closing? That's a fact issue. The toxic tort plaintiffs have alleged that. The district court refused to make any kind of, give any consideration to Wiley's counter-obligations, and instead just hit Arrow, said Arrow had to pay 100 percent. If that was based on the notion that this was all a duty to defend, that as far as the defense cost goes, they were not separable. Your Honor, it's important to keep in mind that this is not in the insurance context. A duty to defend in insurance cases is broader than in non-insurance cases, and California has made it, California law has made it very clear. That wasn't his theory, as I understand it. His theory was that the defense costs were not segregatable with regard to pre- and post-sale pollution. I've seen no California case that in the indemnity context said that the person seeking to enforce the indemnity does not have the burden to allocate its costs to just the covered costs, when there are both covered and non-covered costs. And this case is cited by Wiley in its brief related to prevailing party attorney's fees, which is completely different than the indemnification context. Do you dispute that AERO has the duty to advance defense costs? Not if it's allocated to covered indemnity, not if it's allocated to, and if there is, putting aside the sunset clause and the time bar. But, you know, if it's a covered claim, sure, but they made no attempt, no attempt. They redacted all of their entries, made no attempt to allocate. They said, just a bald conclusion, you know, it's just mixed up. It's mixed, without any consideration of their own counterindemnity obligations or the fact there's very substantial allegations of misconduct in the post-closing era. Now, there's a lot to cover in this case. My yellow light is on. I'd like to come stand back up and do some rebuttal. Sure. Thank you. You may save the rest of your time. Thank you, Ms. Daniel. And we'll hear from a bunch of other people, I guess. Let us know who's on first. We actually have first, second, and third on us. My name is Elizabeth Mann. I am counsel for Eon AG and the Eon Group. And Mr. Loewenmaier is counselor for Wiley. We've agreed amongst ourselves that I will talk no more than 10 minutes and that he will have his full 10 minutes. Having said that, given some of the colloquy that has gone before, I might talk for less than 10 minutes, which I imagine probably wouldn't break your heart, in which case Mr. Loewen might take some of my time. I would simply observe that the Brehman presumptions have been enforced time and time again. There is no case that can be found in the Ninth Circuit where this Court has refused to enforce the Brehman presumptions where you have a forum selection clause that is clear. That's actually not true. There is one. Excuse me? I know there is one in which there was found to be a public interest reason for not enforcing Brehman. I am aware of the versus Jones. Excuse me? GNC Corp versus Jones. Okay. But it wasn't a foreign case. Right. And with respect to a foreign case, I am not aware of any opinion of this Court where this Court, there is a district court that reached a public interest conclusion, but this Court has never, to my knowledge, with respect to a foreign forum selection clause, refused to enforce the forum selection clause and, indeed, has always enforced the Brehman presumptions. Addressing the questions the Court raised earlier, I think that each of the Court's observations are correct. Arrow argues that this should be unwound because of a risk of inconsistent judgments. In fact, what we are dealing with is inconsistent contracts. There is the 2000 share purchase agreement pursuant to which Arrow acquired certain stock from my client, Eon AG, and in the process of acquiring this stock and other assets, it acquired Wiley Electronics. That contract, as we know, contains an unequivocal German forum selection clause and a stipulation that German law will be applied. That contract contains certain indemnities, and there is no doubt that in the lawsuit that Arrow has brought against Eon in Germany, we will litigate the scope and the extent of those indemnities. That contract is a supplemental excerpt of Record No. 3 at Section 7.14. Is there any actual dispute as to the scope of the indemnity as opposed to or as to whether there is an indemnity as opposed to whether the actual costs encouraged to be paid? There is no dispute whatsoever that my client agreed to indemnify Arrow for certain cleanup and remediation costs, and in particular in that contract, the situation in Norco and the situation in Huntsville in Exhibit 5.8 to that contract are called out. So we do not dispute at all that within the scope of the contractual indemnity set out in the 2000 share purchase agreement, we have indemnification obligations. The disagreement that you have with Arrow is in interpreting that agreement as to whether the previous agreements are still alive. We do not. Or whether you're still on the hook for those previous agreements. The disagreement, our disagreement with Arrow deals with the scope of the indemnification obligation under the 2000 share purchase agreement. Any German court will decide the scope of that obligation. The scope meaning what years it applies to or what amounts? No, no. The disagreement, the precise language says that we are responsible for what are referred to as remediation or cleanup costs. Under the 2000 share purchase agreement, the stipulation is Arrow has a cooperation obligation, it has a best efforts obligation, and there is a stipulation that we will remediate. We are obligated to indemnify for remediation expenses to remediate the property to the use for which it was used at the time of the transaction. Should there be some change in use, this fight really has to do with whether the remediation that is being undertaken by Arrow pursuant to the directive of the Department of Toxic Substances Control is a remediation to an intended use which exceeds the indemnified obligation. And this is all within 5.8, Exhibit 5.8. Where is all this spelled out? The indemnification provisions. I know the indemnification provisions. There seems to be two of them. There are two of them, and it is Section 7.10 and Section 7.14, and these are very complicated contracts. My point only is that we do not dispute that in Germany there will be a resolution of the scope of EON's indemnity obligations, and EON will then satisfy those obligations in a manner consistent with the determination of the German court. In the United States, under the 1994 Asset Purchase Agreement, Arrow and Wiley have certain obligations to one another, which it's not my purview to discuss, but certainly those obligations relate to cleanup and remediation expenses for the same site. There may be inconsistent contract language between Arrow's obligations to Wiley Labs or Wiley Labs' obligations to Arrow under the 1994 Asset Purchase Agreement, given that my client is not a party to that contract. It's not really for me to say the scope or nature of those obligations. Our obligations arise under the 2000 Share Purchase Agreement. Arrow has sued us in Germany, seeking its full rights under that contract. Arrow sought to have that litigation stayed in preference to this one. So if and when this process resolves itself, assuming that the court's determination below is affirmed, presumably Arrow will go back to Germany and we will conduct a litigation about the scope. Let me discuss something that hasn't been discussed so far. Something seems to turn on the application of Section 8.5 of the Share Transfer Agreement, Share Purchase Agreement, which I must say I find somewhat hard to read. Does the waiver, does it matter whether there is a waiver, that we understand this provision to be a waiver of any circular rights, or is the mere existence of the indemnity agreement under our case law essentially a waiver of the circular rights? Both facts are important. The existence of the indemnity, when you look at the cases, when you look at Horsehead and when you look at Martin, the courts look at the scope of contractual relationships between the parties and to the extent that there's been an underlying determination of a judgment. The court certainly looks at, shall we say, all of the pieces of the puzzle. Here you have both a waiver and an indemnity provision. One could argue, although not with the facts that were before the court below, one could argue that an indemnity may not be sufficient. One could argue that an indemnity is sufficient. All right. But the waiver, so you're saying something may turn on the waiver clause, essentially, because you think the waiver clause waives. And I find it very hard to read because it says, other than the rights and remedies and so on and so on, you waive any and all rights and remedies of any nature, contractual, quasi-contractual, which is very broad. But if you read it as broad as it reads, you're waiving contractual remedies. Then you go up to A, I think it's A, which says, essentially, but you can bring a case for breach of this agreement for specific performance or for any injunction or court order to enforce any rights. So this is my problem. It seems that if you read the waiver as broadly as you're reading it, it includes contractual rights except as reserved. And as reserved, it isn't clear to me that specific performance injunction or court order includes, essentially, a damages action, which is what? An action for indemnity would be, no? I think that this language has to be read in context of the express indemnity provisions since the contract, at least under our law, German law applies to this contract, but under contracting principles that we're all familiar with, including ERO's lawyers and EON's lawyers, the contract has to be read as a whole, the provisions interpreted in a manner that harmonizes those provisions. It is clear and explicit that EON undertakes indemnity obligations, the scope of which can be litigated elsewhere. Here what you have is an express waiver of all claims, remedies, statutory or otherwise, and a substitution of those claims and remedies for, in essence, the indemnity agreement and the purchaser's rights under the share purchase agreement to assert breaches or violations of this contract or representations or warranties. So as the court below understood this, and I think the proper understanding, is that all claims except those claims set forth in this contract or particularly reserved in this contract are waived, and they are substituted with the broad-based indemnities that are set out in this contract, except for specific carve-outs. There are claims can be maintained for breaches or violations of warranties or something to that effect. But as a general matter, damages claims, statutory claims, tort claims, are waived and substituted with the indemnity provisions. You've used more than your share. If you want to still give this to Lowen sometime. I would like to apologize to Mr. Lowen and sit down. That's okay. And don't charge him for my minute here while I pack up my stuff. Everybody will have some time here. I'm pleased to report I'm Robert Lowen of Gibson Dun & Crutcher. I represent Cross Claimant Wiley Laboratories, Inc., and there actually are just two separate appeals here. Eon has nothing to do with our appeal. Wiley has nothing to do with Eon. Right. But would you mind starting out by helping me out with this attorney's fee and allocation and indemnities, causes of action, what happened to them, what could happen to them? I'll start there by answering your question, Judge Wilkin. The right to contractual indemnity has two features. It has a duty to defend, and it has a duty to pay for any settlement or judgment that may happen down the road. Has that been ruled on? That has not been ruled on. The second feature has not been ruled on. The contractual indemnity. Contractual indemnity can mean both things. Contractual indemnity exclusive of attorney's fees. What happened to that? What happens is that all we asked for was the attorney's fees to pay for the defense of the ongoing matter. The question of indemnity down the road, although partially resolved because of the Sunset Clause decisions on the motion for summary judgment, actually is not ripe at this point in time, but only the issue of the duty to defend is the issue that was before Judge Wilson. But when you say not ripe, is it going to be sued? Are you going to file another lawsuit somewhere else? Yes. Is this lawsuit going to go on? No, you're going to file it somewhere else. No, this lawsuit does not go on, Your Honor. You're going to file it somewhere else. There will be another lawsuit. It might be filed back here, but it's another lawsuit if and when we are wildly arrested to pay money. We may not ever have to pay money, in which case there's no claim for indemnity. Okay. Well, setting that aside then, the allocation of the attorney's fees and the reasonableness of the attorney's fees, how is the reasonableness of the attorney's fees going to be addressed by the state courts? Is there some sort of jurisdiction that the state courts have under which they can address that? Right. We think that it's not the allocation. They do not have the right to address allocation. Right. The question of allocation has been resolved finally by Judge Wilson. What he did was a very unusual procedure. We went back and we looked at the books and we concluded that there is a procedure in California that allows Wiley to seek enforcement of that judgment and then therefore have the state court judge resolve the issue of the reasonableness of attorney's fees as they are incurred. And we have some attorney's fees. We put them in front of the judge and we would ask him to please do that. You're satisfied that that's going to happen? You're satisfied that that's going to work out? Yes. The state court judge will take jurisdiction to do that. But what about the allocation? What if we were to say that the court was right, that the attorney's fees that have been incurred so far cannot be allocated because they're not sufficiently severable? But we don't know what will happen in the future. What if all the claims that could implicate them are resolved in their favor and there are still some claims against you and it then becomes perfectly clear that everything that you're incurring subsequently can be allocated? Who could decide that? The easy answer is that this court need not concern itself with that because that issue has been finally determined by Judge Wilson. Here's why. Well, but it's being appealed. There's three separate independent reasons why Arrow was wrong on its allocation argument. Reason number one is they did not raise it properly in the court below. Two aspects to that. Aspect number one is that there was a motion for summary judgment. It was not a motion for summary adjudication of the sunset provision. It was for summary judgment entirely. Arrow chose to defend that entirely based on the sunset provisions. It did not argue that there are some uncovered claims over here. When it got to the final accounting to determine the amounts of attorney's fees and damages, et cetera, for the first time Arrow said, oh, we lost our prior argument, let's make a new argument. There are uncovered claims here that need to be allocated. But in the context of, and Judge Wilson simply said in his order, his resolution order, I'm not going to do that. That's clearly within his discretion not to reconsider or relitigate those issues. That's not really what he said. I thought what he said is that they're intertwined and therefore I'm not going to do it. I'm sorry, I didn't hear that. I thought he said substantively that they're intertwined and therefore I'm not going to do it. He said that, too. He said in the alternative. If you look at resolution order, at the resolution order, which is excerpt of record 59, page 767, that's where he deals with this. And he says there's two reasons here. First of all, he doesn't say the words they didn't raise it. He said I've already decided this on summary judgment and I'm not going to allow Arrow to relitigate this. And then he said alternatively, he uses the word alternatively, and then he says they're intertwined. And I'm going to get to the intertwined argument because I think that he's right about that as well. But the important thing here is that it's totally within his discretion to say I'm not going to allow you to relitigate issues that should have been brought up on summary judgment. And so that's a reason to affirm him right there on the allocation issue, and there's no reason for this court to go beyond that. But there's more than that, Your Honor. When you look at the allocation brief by Arrow, when they talk about the allocation issue, I'm sorry, the resolution brief by Arrow, which is, I think, excerpt of record number 66, in that excerpt of record they do argue about allocation and they do argue a little tiny bit about their cross-claim for indemnity or something like that, for the cross-indemnity. But in each instance they end by saying what they ask the court to do is to abstain. They don't ever ask the court to allocate. So the question is simply was the district court correct in denying the motion to abstain? Well, that I wonder about, because, in fact, you say that the issue of the damages of the defense cost is right, but it's only, as Judge Wilkin points out, ripe up to a point. That is, we don't know anything about the future. No, but what you know about the future is you know what the record shows, okay? The record here is really clear. I would invite the court's attention to Wiley's excerpt of record number 18, which is the reply on the separate statement of facts, and you see how the issues were joined in the summary judgment motion. And there you have Arrow not disputing that TCE is the principal contaminant of concern, and they don't dispute that, in fact, TCE escaped during pre-closing conduct. And although they say they dispute about post-closing, in fact they have no evidence to offer that TCE was ever used in post-closing conduct, and there's overwhelming evidence that it was not, okay? So this lawsuit is about contamination that happened on Arrow's watch. That is all known today. That is not going to change. But there's more to it than that. That's the major portion of it, but it's not just TCE and it's not just at that time frame. There's other alleged contaminants. There's other alleged actions, fraudulent misrepresentation, cover-ups, this, that, and the other. Well, you can speculate all day about what other things somebody might try and bring out. That's not what the present duty of defense is about. But they're in the complaint, I thought. Aren't these other things in the complaint in the toxic torque cases? Right. If you look at the complaint, in the Austin complaint, they do have general allegations against all the defendants that are kind of the normal things you get in these kind of toxic torque cases, where they say, you know, yeah, you should have prevented it from going off-site, and you should have. So why wouldn't it have made more sense to just say, stop, wait, when the case is over, we'll figure this out? Because that's not what Arrow's duty is under this contract. Arrow has never argued that it does not have a present duty to defend under the contract. So, therefore, they've waived any argument that it doesn't have a present duty to defend. It would be inappropriate for the courts, then, to say that it does not have a present duty to defend. If it has a present duty to defend, then it should pay for all past costs, and it should pay for future costs on an ongoing basis. It should pay for them, perhaps, but subject to an allocation in the future, I would think, as to whether they really were allocable and whether there really were things that weren't covered. No case is ever so held, Your Honor. This idea of allocation, we do agree that it's a matter of contract interpretation, okay, as to how to allocate. But on the allocation question, let's focus on, number one, what does this contract say? Yes, those things that are alleged in the complaint, such as you failed to do something to keep the contamination from going off-site, you failed to disclose it, those sorts of things, those are all covered by Arrow's indemnity. Arrow's indemnity says that, you know, the language of the indemnity says that anything connected to or anything arising from the pre-closing conduct is, in fact, was indemnified. All these post-closing events are all connected to the pre-closing contamination, and, therefore, they're all covered. So there's nothing to allocate here. And there's been no proof that there's any allegations at all that aren't connected to the pre-closing conduct. I think there's an allegation of some sort of fraudulent misrepresentation on Wiley's part after Wiley took over. I understand that the allegation is against all the defendants, not against Wiley particularly, okay. But if you look at the complaint, the allegation is it's concealment of the fact of the contamination. That's what the allegation is in the Austin complaint. That's connected to the pre-closing conduct. But even if it weren't, even if it weren't, the law is clear that even where you have allocable versus non-allocable situations with attorney's fees, if you have the core facts overlap between the two, then it's clear, the law is clear that there is no allocation, that the attorney's fees are to be paid, even if there is a non-covered act in there. And here it's all about the contamination. That overlaps everything else. There's been no evidence by Arrow to the contrary. The main reason being that they didn't really raise it in the court below on summary judgment when they should have.  No, but that, Your Honor, is a matter of stipulation. Arrow agreed to that, okay? That's in the record, Your Honor. Arrow said it is better to have the summary judgment decided. Wiley and Arrow together agreed, and Judge Wilson signed the stipulation, and that's why it happened. It's not like it was something that they've been deprived of their day in court on this issue. So I haven't got a chance to address the first issue because of all the questions. If you'd like me to address the substantive issue and the merits of the contract. I think we have about as good a handle as we're going to get. Okay, thank you so much, Your Honor. Thank you. And Ms. Daniel has some rebuttal time remaining. Just briefly to follow up on this bit about the answer not having been filed, absolutely. The summary judgment was invited by the district court, and it went solely to the sunset issue. That's a threshold issue. That was really a motion to dismiss, that the court turned into a summary judgment on that discrete issue. So we filed, everybody agreed in the court and approved the stipulation that our answer would be due after the ruling on the sunset issue. And the question of allocation goes to damages. It does not go to that initial sunset issue. And just one more thing on the liability on the cross-claim. That contract will make your eyes glaze over. It's tedious. But please, we would refer you to our reply brief on that. Now, going back to the Eon side of things, it's not like there's no case that has ever before refused to apply the public policy exception in the environmental context. Errol has cited a number of cases that have applied the public policy exception under the Bremen Doctrine in the environmental context, because this is an issue of public health, safety and welfare, a concern to the public and the regulators. Well, it certainly would be if they were trying to bring this circular issue over to Germany, but that's not what's happening here. No one is trying to bring the circular issue to Germany. As I understand the structure of your case, and it would be helpful, I think, to make sure I do understand it, there are two things going on. One of them is that you're arguing that there is another strain of liability here which is directly under surplus and which doesn't go to Germany. And everybody, as I understand it, agrees that if there is another strain of liability here under surplus, it doesn't go to Germany. But their argument is that there isn't one because of the waiver provision and because of the indemnity clause. And then on the other hand, you have the question of whether the contract case itself goes to Germany. Do I have at least a piece that's right? I think essentially, yes, they're saying that the contract case goes to Germany. And you're saying that, A, the contract case doesn't go to Germany. B, there's another case, a circular indemnity under 107, which if it exists, everybody agrees doesn't go to Germany. Right. So it's that other case, the 107 case, as to which it seems to me you would have a major public policy claim if there was a or the contribution case under circular if that's what was trying to be sent to Germany, but that isn't what's trying to be sent to Germany. We have a public policy case with respect to both. And the cases that I've cited that have enforced a public policy exception have done so on contractual indemnities, not statutory indemnities. And I want to make clear that ARO is not trying to dodge Bremen. ARO wants to enforce Bremen, that the public policy exception is there. And also the purpose, the goal of Bremen is very important to keep in mind. Can you tell me what cases you're talking about in which there's been a Bremen clause that wasn't enforced? Okay. Where the issue was private indemnity and there was, in fact, a foreign selection clause. Yeah. The DH oil case. Now, these, it's true, they're domestic cases, but they're applying the Bremen presumption of validity and the exceptions. Well, in the domestic cases, you don't apply a presumption of validity. But the courts do. They do, and they go back to Bremen. The DH oil case is one. Kaniwa is another. They're cited in the briefs. And also the Ford case, California case, dealt with the, it dealt with an insurance contractual indemnity, and it made that strong public policy point in the venue context, even though it was a private indemnity, no Superfund statute involved. But it said there was no foreign selection clause there. No, but it found that the policy, the public policies were the more important aspects of it. And, again, we have other factors not present there that weigh on, go to that Bremen exception. I see the red light. It's on. I'd like to, if I could, finish the sentence I was embarking on. Yes, please. Please sum up. Okay. Again, going back to the goal of Bremen. The goal of Bremen was to bring the American courts in line with the international community, to overcome a parochial attitude that was prevalent in our court system there. There is nothing parochial about rejecting the German forum clause in this case, when Germany itself would refuse to enforce a foreign forum clause with respect to domestic pollution liability. And for that reason and the other reasons in our briefs, we respectfully urge the court to reverse the judgment in Ian's favor and also the judgment in favor of Wiley-Labs. Thank you, counsel. We appreciate the arguments of all counsel. The case just argued is submitted. And our final case on this morning's docket is United States v. Alcazar-Sanchez. Thank you.
judges: Graber, Berzon Cjj / Wilken (N. Cal.) Dj